George SPIEGEL, Appellant,

v.

PUBLIC UTILITIES COMMISSION OF THE DISTRICT OF COLUMBIA and Capital Transit Company, Appellees.

No. 12523.

United States Court of Appeals District of Columbia Circuit.

Argued April 22, 1955.

Decided July 8, 1955.

Petition for Rehearing in Banc Denied Sept. 9, 1955.

Certiorari Denied Nov. 21, 1955.

See 76 S.Ct. 182.

Mr. George Spiegel, appellant pro se.

Mr. Lloyd B. Harrison, Sp. Asst. Corp. Counsel for the District of Columbia, with whom Messrs. Vernon E. West, Corp. Counsel, and J. Hampton Baumgartner, Jr., Asst. Corp. Counsel, were on the brief, for appellee Public Utilities Commission of the District of Columbia.

Mr. W. V. T. Justis, Washington, D. C., with whom Messrs. Edmund L. Jones, F. Gloyd Awalt and F. Keith Kelly, Washington, D. C., were on the brief, for appellee Capital Transit Co.

Before WASHINGTON, DANAHER and BASTIAN, Circuit Judges.

WASHINGTON, Circuit Judge.

This is an appeal by a transit rider from a judgment of the District Court affirming an order dated January 20, 1954, of the Public Utilities Commission of the District of Columbia, which grant-

ed a rate increase to the Capital Transit Company. The opinion of the District Court (Judge Keech) sets forth the facts in some detail. Allied Civic Group, Inc., v. Public Utilities Commission, D.C. 1954, 125 F.Supp. 453.

■ The appellant relies in this court on two principal contentions, both of which the District Court over-ruled: first, that under the circumstances of this case the Commission cannot properly use a rate base resting on the original cost of the Transit Company's properties, and, second, that the Public Utilities Commission has jurisdiction, which it failed to exercise, to regulate fares for Transit's operations between points within the District of Columbia and points within Maryland. These two contentions are dealt with in Parts 10 and 12 of the opinion of the District Court. 125 F.Supp. 460, 461. In reference to the second point mentioned, we are satisfied that there is no error.

The importance of the first question presented needs no underscoring. The choice of a proper rate base is, of course, vital to the setting up of a sound and workable fare structure. In that regard the Commission's opinion has this to say:

"Rate Base

"The Commission has in the past consistently stated, as the rate base, the amount reflecting the historical cost of property used and useful in the Company's transit operations in the District of Columbia, stated at the cost to the owner first devoting the properties to public use, less accumulated depreciation per books— plus a single working capital allowance in respect of the cost of materials and supplies. See In re Capital Transit Company, Formal Case No. 417, decided August 21, 1952; id., Formal Case No. 413, decided January 4, 1952; id., Formal Case No. 396, decided June 28, 1950.

"For the purposes of the present proceedings, the Commission staff has developed on this method the amount of $23,420,691, representing the weighted investment in rate base property for the Future Annual Period, adjusted *inter alia* in respect of depreciation in accordance with the stipulation in Formal Case No. 427 mentioned above, and allocated on a 93+% basis to the District of Columbia. (Commission Exhibit 38, Schedule 3.) The Company, which had contended for certain higher amounts representing rate base in their exhibits and testimony, has accepted the figure thus developed by the Commission staff. (Company Brief, p. 4.)

"For the purposes of this proceeding, we find and conclude that $23,420,691 is the Company's rate base on which a return is allowable.

"Although an 'original cost' basis for rate making is thus continued for the purposes of the present case, it is to be observed that the real value in the market place of the Company's operating properties have been seriously affected by the steady and rapid decline in passenger riding sustained, over a long period of time, except for a brief period during World War II. Economically, the transit industry and the Company are contracting, capitalwise, rather than stable or expanding operations.

"This fact was reflected in the sale, on September 12, 1949, from the North American Company to S. E. Wolfson and Associates (hereafter called the 'Wolfson Group') of 45.61% of the Company's stock, carrying effective control of the Company, for $20 per share. On this basis, the then value of 100% of the stock was $4,800,000. Under somewhat similar circumstances, when 100% of the property of a transit company was sold for $7,500,000, the California Commission determined a rate base of $7,950,000 (the price at which the properties had been offered for sale) despite indicated historical costs on

the order of $25,000,000 and book value of over $41,000,000 covered by Commission approved securities of over $37,000,000. This rate base was sustained by the Supreme Court, because of the economic plight of the street railway involved. Market Street R. Co. v. Railroad Comm. of Cal., 324 U.S. 548, 564–568 [65 S.Ct. 770, 89 L.Ed. 1171]. As observed by Justices Black, Douglas and Murphy, concurring in the Nat. Gas Pipeline Co. case [Federal Power Commission v. Natural Gas Pipeline Co.] supra, [315 U.S. 575] at page 608, [62 S.Ct. 736, 753, 86 L.Ed. 1037] 'The investor and consumer interests may so collide as to warrant the rate-making body in concluding that a return on historical cost or prudent investment, though fair to investors, would be grossly unfair to consumers.'

"We do not suggest that the Company's present situation demands that the determination of rate base on original cost methods be abandoned at this time. We do note that continuation or accentuation of present riding declines may in the future produce a situation—due to economic circumstances rather than Commission action—in which a return within the conventionally 'reasonable' range cannot realistically be estimated on an original cost rate base to be produced from reasonable fares." (Order, pp. 4–5)

In its discussion of "Controlling Principles," which prefaced the passage just quoted, the Commission said:

"In considering the rights of the investors, we properly give weight to the Company's practical situation as a unit of a 'generally sick industry', beset by competition, and with an investment 'already impaired by economic forces.' Market Street R. Co. v. Railroad Comm. of Cal., 324 U.S. 548, 554 [65 S.Ct. 770, 89 L.Ed. 1171]. In this industry, we can and do take account of the practical results of fare increases in respect of the withdrawal of public patronage 'from the Company; Id., 324 U.S. at [page] 563–564 [65 S.Ct. 770].

"In view of rapid current decline in transit riding, discussed later, it is obviously in the long-term interest of the investors, as well as the interest of transit riders and the community, that fares be kept at the lowest level consonant with the preservation of the Company in private hands, in a healthy operating condition. Thus, the investors would suffer with the public if, as suggested in the record, excessive fares produced a boycott of the use of mass transit. It is clear that the interests of all are fostered by fare structures and Company policies designed to encourage mass riding.

"Second, we have no duty to impose unreasonable transit fares in order simply that stockholders may earn dividends. Covington & L. Turnp. Road Co. v. Sandford, 164 U.S. 578, 596. [17 S.Ct. 198, 41 L.Ed. 560]. We should attempt to set fares sufficient to secure a fair return to the investors 'provided the business is capable of earning it. But regulation does not insure that the business shall produce net revenues.' Federal Power Comm. v. Nat. Gas Pipeline Co., 315 U.S. 575, 586 [62 S.Ct. 736, 86 L.Ed. 1037]. No more can be exacted from the public than the service is reasonably worth (Smyth v. Ames, 169 U.S. 466, 547 [18 S.Ct. 418, 42 L.Ed. 819]).

"Third, we are not bound to the use of any single formula or combination of formulae in setting rates of fare. Rate making bodies are 'free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances.' Federal Power Comm. v. Nat. Gas Pipeline Co., 315 U.S. 575, 586 [62 S.Ct. 736, 86 L.Ed. 1037]; Federal Power Comm. v. Hope Nat. Gas

Co., 320 U.S. 591, 602 [64 S.Ct. 281, 88 L.Ed. 333]. 'The particular circumstances' of the Company include not only the conventional problems of rate base, expense and rate of return, but in addition include (1) problems general to the transit industry such as 'normal decline' in numbers of passengers and additional decline in passengers attributable to refusal to pay higher fares, (2) special additional problems of the Company, such as the traffic conditions in Washington, with concomitant community interest in mass transit as a partial solution to overcrowded streets, and deterioration of public relations due to public reaction against dividend policies of the present management." (Order, p. 3)

The findings and conclusions we have quoted could well, we think, have supported a conclusion by the Commission that the rate base should be set at a level reflecting the current value of the company's properties, viewed realistically. Market Street Railway Co. v. Railroad Commission, 1945, 324 U.S. 548, 65 S.Ct. 770, 89 L.Ed. 1171. But the Commission did not then adopt such a rate base. Instead of following its quoted findings to what would appear to be their logical conclusion, the Commission reached a different conclusion. As we have seen, it arrived at a rate base in the amount of $23,420,691, representing the company's original property investment, as weighted and adjusted by the Commission. And the Commission's reasons for using the original cost rate base do not clearly appear from its opinion and order. This gives us our present concern, not because we mean to intimate which base should predicate Commission action, but because we cannot properly exercise our appellate function unless the Commission states the reasons for the course it decided to follow. The fact, of course, that the original cost rate base had been used on previous occasions is not a sufficient reason, without more, for continuing its use. As we said in a somewhat similar context:

"While under certain circumstances, reliance on a prior proceeding for this purpose might be permissible, such circumstances do not exist in this case. There is nothing before us to indicate that pertinent local conditions and economic conditions generally have remained static during the intervening years." Washington Gas Light Co. v. Baker, 1950, 88 U.S.App.D.C. 115, 121, 188 F.2d 11, 17, certiorari denied, 1951, 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686.

On the larger issue, that of granting increased rates to the Transit Company, the Commission's basic reasons for the grant appear to be evidenced by the following quotations:

"Within the limitations of general transit economies, we propose to determine fares sufficient to provide the Company with a return adequate, under efficient and economical management, to support the Company's credit and to maintain its financial soundness." (Order, p. 24)

"Under the circumstances of this case, we are unable to fix a rate of return high enough to restore the economic decline in the market value of the Company's stock which occurred many years ago. We further conclude that a return that is sufficient to protect the financial integrity of the Company, that will permit of the raising of such additional capital as may be needed for the foreseeable future, and will permit of the payment of reasonable dividends to the investors in equity capital, constitutes a fair rate of return, and that a return falling within the range of 6-1/4% to 6-1/2% will meet these requirements.

"Under the fare structure determined upon considerations hereafter detailed, the Company may reasonably anticipate a rate of return of approximately 6.32% on the original cost rate base devoted to rendering service in the District of Columbia, which, under all the circumstances,

is fair and reasonable to the Company and to the investors." (Order, p. 26)

"After establishing that it is necessary to raise the present level of fares in order that this Company may have a reasonable prospect of earning a fair return (see page 20), the next problem is to determine the form which the higher schedule of fares should take." (Order, p. 30)

The considerations just indicated may, of course, properly be taken into account by the Commission in reaching its final decision. But they must be balanced against other relevant factors. They cannot be regarded, standing alone, as justification for adopting the original cost rate base as contrasted with other possible bases.[1] "The investor and consumer interests may so collide as to warrant the rate-making body in concluding that a return on historical cost or prudent investment, though fair to investors would be grossly unfair to the consumers." Federal Power Commission v. Natural Gas Pipeline Co., 1942, 315 U.S. 575, 608, 62 S.Ct. 736, 753, 86 L.Ed. 1037 (concurring opinion; quoted by the Commission in its order here under review at p. 4).

We are not here expressing a judgment as to what rate base the Commission should have adopted. That is not our function; we could not substitute our own view on such a question—if we had reached a view—for that of the Commission. Federal Power Commis-

sion v. Colorado Interstate Gas Co., 1955, 348 U.S. 492, 75 S.Ct. 467. Nor are we saying that the Commission may not ultimately be able to justify its adoption of the original cost rate base, if it decides to adhere to that course. But we do say that the decision of the Commission must be based on a "suitably complete statement" of its reasons for its conclusions. Florida v. United States, 1931, 282 U.S. 194, 215, 51 S.Ct. 119, 75 L.Ed. 291, citing Beaumont, S. L. & W. Ry. v. United States, 1930, 282 U.S. 74, 86, 51 S.Ct. 1, 75 L.Ed. 221. And see Capital Transit Co. v. Public Utilities Commission, 93 U.S.App.D.C. 194, 205, 213 F.2d 176, 186–187 (separate opinion of Chief Judge Stephens), certiorari denied, 348 U.S. 816, 75 S.Ct. 25.

Concluding, as we do, that the report and order of the Commission do not reflect an adequate statement of its reasons for adopting the original cost rate base, we must reverse the judgment of the District Court, with directions to remand the case to the Commission for such further action on its part as may be consistent with this opinion. Pending such further action, which should be taken without unreasonable delay, the District Court may permit the Commission's order to remain in effect. Any new finding or order issued by the Commission will be subject to judicial review in the ordinary course. Under the circumstances, we do not deem it necessary to pass on the remaining contentions of the parties.

So ordered.

---

[1]. The same may be said of the Commission's findings—made in connection with its examination of the investors' situation rather than its study of the rate base problem—that "the Company is in an excellent condition financially, as compared to the transit industry generally" (Order, p. 7), and that the market price of its stock in 1953 was about three times what it was in 1949 (Order, p. 5).